1  **Sean M. Sherlock (SB#161627)**
   **ssherlock@swlaw.com**
2  **Snell & Wilmer L.L.P.**
   **600 Anton Boulevard, Suite 1400**
3  **Costa Mesa, California  92626-7689**
   **Telephone:  (714) 427-7000**
4  **Facsimile:  (714) 427-7799**

5  **Attorneys for Defendant**
   **PACIFIC WEBWORKS, INC.**

6

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11  Deanna Pelletier,                          CASE NO.

12                     Plaintiff,              **NOTICE OF REMOVAL**

13  vs.                                        DATE OF FILING:  No Date Set

14  Pacific Webworks, Inc.,

15                     Defendant.

16

17         Defendant Pacific Webworks, Inc. ("Webworks") hereby gives notice of the

18  removal of the above-entitled action from the Superior Court of the State of

19  California, County of Solano, Civil No. FCS034684, to the United States District

20  Court for the Eastern District of California. In support of its removal, Webworks

21  states as follows:

22         1.      Plaintiff, Deanna Pelletier, filed her Class Action Complaint and Jury

23  Demand ("Complaint") in the Superior Court of the State of California, County of

24  Solano, on or about November 12, 2009 (a copy of the complaint is appended

25  hereto as Exhibit A).  The Complaint was served on a registered agent of

26  Webworks on November 20, 2009 (a copy of the summons is appended hereto as

27  Exhibit B).  No other pleadings have been filed or otherwise received by

28  Webworks.

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

2.     As required by 28 U.S.C. § 1446(b), this Notice of Removal is filed with this Court within thirty days of Webworks' receipt of the Complaint.

## DIVERSITY OF CITIZENSHIP AND PUTATIVE CLASS MEMBERSHIP

3.     Plaintiff Deanne Pelletier is a California resident. (Compl. ¶ 1.) Webworks is a corporation organized under the laws of the State of Nevada. (Id. ¶ 2.) Webworks does business in a number of states. Webworks is headquartered in Salt Lake City, Utah. (Id.) Therefore, there is diversity of citizenship between Ms. Pelletier and Webworks so the diversity requirement is met under the Class Action Fairness Act, as defined under 28 U.S.C. § 1332(d)(2)(A).

4.     As explained below, the number of members of all proposed plaintiff classes in the aggregate is greater than 100, and no defendant is a state, state official, or governmental entity. 42 U.S.C. § 1332(c)(5)(B).

## AMOUNT IN CONTROVERSY

5.     Plaintiff, Deanne Pelletier, seeks damages on behalf of herself and "a Class of similarly situated individuals," defined as "all California residents who submitted payment information to Pacific Webworks for the purpose of obtaining Pacific Webworks' products or services, and who were charged any amount other than the stated shipping and handling or discounted fee." (Compl. ¶ 44.)

6.     Plaintiff's Complaint does not plead a specific amount of damages, nor does it allege damages that are less than the amount necessary to satisfy federal jurisdiction. Instead, the Complaint specifically disclaims any allegation of an amount in controversy. The Complaint states that the Plaintiff "makes no specific allegation that the amount in controversy (including requests for attorney's fees, injunctive relief, etc.) exceeds any specific amount. Specifically, Plaintiff makes no allegations that the amount in controversy exceeds $5,000,000." (Compl. ¶ 43 (emphasis added).) Importantly, Plaintiff and the putative class do not affirmatively limit the damages claimed to an amount less than $5,000,000. (Compl. ¶ 43.)

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

7.     When the plaintiff does not allege an amount in controversy, as is the case here, the defendant can remove to federal court by showing that the amount in controversy exceeds the jurisdictional threshold. <u>Abrego Abrego v. Dow Chem. Co.</u>, 443 F.3d 676, 685 (9th Cir. 2006) ("We therefore hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction."); <u>id.</u> at 683 ("Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met."). Under the preponderance of evidence standard, "the defendant must provide evidence establishing that it is more likely than not that the amount in controversy exceeds [the threshold] amount." <u>Sanchez v. Monumental Life Ins. Co.</u>, 102 F.3d 398, 404 (9th Cir. 1996) (internal citations and quotation marks omitted).

8.     The Class Action Fairness Act provides for federal court jurisdiction over class action suits when the "amount in <u>controversy</u>" exceeds $5 million. <u>See</u> 28 U.S.C. § 1332(d)(2). In petitioning this Court for removal, Webworks in no way concedes the truth of the allegations in the Complaint, admits liability, or concedes that Plaintiff would be entitled to recover any or all of the amounts claimed. (<u>See</u> Declaration of Ken Bell, dated December 17, 2009 ("Bell Decl.") ¶ 3 (appended hereto as Exhibit C).) Such an admission is not required. "[T]he statute does not make federal jurisdiction depend on how much the plaintiff is due to recover. The question is what amount is in controversy." <u>Spivey v. Vertrue, Inc.</u>, 528 F.3d 982, 985-86 (7th Cir. 2008) (internal citations omitted). In calculating the amount in controversy, Webworks relies on the allegations in the Complaint and assumes their truth for the purposes of this Notice of Removal only. <u>Id.</u>; <u>see also</u>, <u>Brill v. Countrywide Home Loans, Inc.</u>, 427 F.3d 446, 449 (7th Cir. 2005) (holding that the defendant "did not have to confess liability in order to show that the controversy exceeds the threshold"); <u>id.</u> ("[P]art of the removing party's burden is to show not only what the stakes of the litigation *could be*, but also what they *are* given the

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

1  plaintiff's actual demands. . . . The demonstration concerns what the plaintiff is

2  claiming (and thus the amount in controversy between the parties), not whether

3  plaintiff is likely to win or be awarded everything he seeks.") Thus, without

4  admitting liability, Webworks respectfully submits that the amount in <u>controversy</u>

5  exceeds the $5 million threshold for federal jurisdiction.

6      9.      Plaintiff seeks each of the following five categories of damages, which

7  must be considered for purposes of determining the amount in controversy: (1)

8  general damages, which requires an examination of purportedly unauthorized

9  charges to the credit and debit cards of the prospective class; (2) punitive damages;

10  (3) attorneys' fees; (4) civil penalties under the Consumers Legal Remedies Act

11  ("CLRA"); and (5) injunctive relief, which would affect Webworks' prospective

12  operations.

13      <u>General Damages:</u>

14      10.      Plaintiff seeks compensation for potential class members, who would

15  potentially include all Webworks' customers residing in California. (Compl. ¶ 44.)

16  Under the first and third causes of action, Plaintiff seeks "full restitution of all

17  funds wrongfully obtained" through Webworks' advertising and billing system

18  under the False Advertising and Unfair Competition laws.  (Compl. ¶¶ 51-56, 65-

19  77.)  Under the fourth cause of action, the Plaintiff and the Classes seek restitution

20  of "charges placed on their credit card bills by Pacific Webworks." (Compl. ¶ 79.)

21  Under the fifth cause of action, the Plaintiffs claim that Webworks breached a

22  contract with the Plaintiff and potential class members by adding "additional

23  undisclosed charges" on their credit and debit cards. (Compl. ¶ 86.)

24      11.      To determine the amount in controversy for these claims, the Court

25  must consider charges on accounts of California customers from April 2007 to the

26  present.  (Bell Decl. ¶ 5)  According to the allegations of the Complaint, Ms.

27  Deanne Pelletier was charged an additional $104.80 per month for which she seeks

28  restitution. (Compl. ¶ 38-41.)  The Complaint alleges that customers were charged

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

NOTICE OF REMOVAL

two recurring fees of $79.90 per month and $24.90 per month and these are the charges for which restitution is sought. (Compl. ¶ 31.)

12.  For the period from April 2007 to the present, Webworks had 84,150 customers who reside in California. (Bell Decl. ¶ 6.) All or substantially all of those customers pay Webworks by credit or debit card. (Id. ¶ 7.) Assuming, arguendo, the accuracy of the allegations in the Complaint, and further assuming that each customer was only charged a single monthly charge of $104.80, the restitution claim alone would place in controversy the amount of $8,818,920. If you assume that customers were charged recurring monthly charges as Plaintiff alleges (Compl. ¶ 31), the amount in controversy would increase by a multiple of that amount.

Punitive Damages:

13.  Plaintiff also seeks punitive damages, although the Complaint does not specific the claims under which it seeks punitive damages.[1] (Compl., Prayer for Relief c.) Punitive damages awards must be considered in calculating the amount in controversy for jurisdictional purposes. Yates v. Nimeh, 486 F.Supp.2d 1084, 1089 (N.D. Cal. 2007) ("In calculating the amount in controversy, the Court must also consider punitive damages that plaintiff can recover as a matter of law."). Under California law, "exemplary damages" are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." See West's Ann. Cal. Civ. Code § 3294. "Exemplary damages must bear a reasonable relation to actual damages even though no fixed ratio exists to determine the proper proportion." Liodas v. Sahadi, 562 P.2d 316, 319 (Cal. 1977) (internal citations omitted). Assuming, arguendo, that punitive damages are appropriate here as alleged by Plaintiff, even a modest 1:1 ratio places the amount in controversy well above $5 million. ($8.8 million plus $8.8 million = $17.6 million.)

---

[1] The California Consumer Legal Remedies Act allows for punitive damages, see Cal. Civ. Code, § 1780(a)(4), but the Plaintiff has explicitly disclaimed "all claims for damages under the CLRA at this time." (Compl. ¶ 64.)

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

1    Attorneys' Fees:

2        14.    Plaintiff also seeks recovery of attorneys' fees. (Compl. ¶¶ 64, Prayer

3    for Relief d.)  The CLRA under which Plaintiff brings her second cause of action

4    provides that the "court shall award court costs and attorney's fees to the prevailing

5    plaintiff in litigation filed pursuant to this section." West's Ann. Cal. Civ. Code

6    Section 1780(e) (emphasis added).  The Plaintiff also claims attorneys' fees under

7    Cal. Code Civ. Proc. Section 1021.5, which provides that a court can award fees in

8    its discretion.[2]  (Compl. ¶¶ 56, 77.) Both mandatory and discretionary attorneys' fee

9    awards can be considered by the Court in determining the jurisdictional amount.

10   Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1156 (9th Cir. 1998) ("[W]here an

11   underlying statute authorizes an award of attorneys' fees, either with mandatory or

12   discretionary language, such fees may be included in the amount in controversy.").

13       15.    The Plaintiff has retained a purportedly experienced class action firm,

14   Kamber Edelson, LLC, to bring suit on behalf of the putative class.  (Compl. ¶ 20.)

15   The average attorney fee award in class action cases in the federal courts, as

16   determined by a Federal Judicial Center survey, is 29 percent of the total recovery.

17   See Gregory G. Wrobel & Michael J. Waters, "Early Returns: Impact of the Class

18   Action Fairness Act on Federal Jurisdiction Over State Law Class Actions," 21-

19   FALL Antitrust 45, 50 (Fall 2006).  Plaintiff's request for attorneys' fees therefore

20   places in controversy an additional amount of somewhere between $2.9 million and

21   $5.9 million (depending on whether one includes or excludes a punitive damage

22   award).

23

24

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

25   [2] The section provides that "Upon motion, a court may award attorneys' fees to a successful party

26   against one or more opposing parties in an action which has resulted in the enforcement of an
     important right affecting the public interest if: (a) significant benefit, whether pecuniary or

27   nonpecuniary, has been conferred on the general public or a large class of persons, (b) the
     necessity and financial burden of private enforcement . . are such as to make the award

28   appropriate, and (c) such fees should not in the interest of justice be paid out of the recover, if
     any." Id.

16.    As shown above, Plaintiffs' claims for general damages, punitive damages, and attorneys' fees, by themselves, place the amount in controversy well in excess of $5 million.

Civil Penalties:

17.    In the prayer for relief, Plaintiff requests that the Court award "civil penalties . . . for violations of the above-cited statutes and law." (Compl. at 19.) Plaintiff does not reference any particular statute or law that would entitle Plaintiff or members of a class to recover civil penalties, or specify the amount or circumstances under which the Court could award civil penalties.  But assuming, arguendo, that the putative class consists of all or substantially all of Webworks' customers in California (approximately 84,150), a "civil penalty" award of less than $100 to each member of the class would, by itself, place in controversy more than $5 million.

Injunctive Relief:

18.    Finally, Plaintiff seeks injunctive relief.  Under Count 1, Plaintiff "seeks an order requiring the Defendant to . . . immediately stop the unlawful practices stated in this Complaint," specifically "dissemninat[ing] untrue and/or misleading statements through online advertising in order to sell or induce members of the public to purchase work-at-home products . . . ." (Compl. ¶¶ 54, 56.)  Under Count 2, Plaintiff "seeks injunctive relief requiring Defendant to cease and desist the illegal conduct stated in this Complaint," specifically "deceptively inducing the Plaintiff and all members of the Class . . . to purchase a product with deceptive and misleading advertisements by failing to clearly and conspicuously disclose the prices of the goods and services and by placing unauthorized charges on their credit card accounts."  (Compl. ¶¶ 62, 64.)  Under Count 3, Plaintiff "seeks an order requiring the Defendant to immediately" and permanently stop "advertising that fails to clearly and conspicuously disclose the actual price of its products, and

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

1   inducing Plaintiff and members of the Class . . . to proffer payment information

2   based on that misrepresentation." (Compl. ¶¶ 76-77.)

3        19.    Although Webworks disputes any implication that its conduct is

4   illegal, the injunctive relief sought clearly seeks to permanently close down

5   Webworks' entire business operation.  (Id. ¶ 77.)  By requesting injunctive relief,

6   Plaintiff is essentially asking the Court to order the Defendant to stop all business

7   operations in the State of California.  Because its business operations are web-

8   based, it would be difficult if not impossible to limit its business to non-California

9   residents.  For that reason, a successful injunction would cause damages well in

10   excess of $5 million.  (Bell Decl. ¶ 8.)

11        20.    A preponderance of the evidence shows that this class action is one

12   over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

13   See Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, (9th Cir. 1996) (holding

14   that under the preponderance of the evidence standard, "the defendant must provide

15   evidence establishing that it is more likely than not that the amount in controversy

16   exceeds [the threshold] amount"); Abrego Abrego v. Dow Chem. Co., 443 F.3d

17   676, 683 (9th Cir. 2006) ("Where the complaint does not specify the amount of

18   damages sought, the removing defendant must prove by a preponderance of the

19   evidence that the amount in controversy requirement has been met.").

20        21.    Consequently, the case may be removed to this Court by Webworks

21   pursuant to the provisions of 28 U.S.C. § 1446 because it is a class action in which

22   the named plaintiff "is a citizen of a State different from any defendant" and

23   because the "matter in controversy exceeds the sum or value of $5,000,000,

24   exclusive of interest and costs." 28 U.S.C. § 1332(d)(2).

25        22.    A copy of this Notice of Removal is being serve upon Plaintiff through

26   her attorneys of record, and filed with the Clerk of the Superior Court of the State

27   of California, County of Solano, as provided by 28 U.S.C. § 1446(d).

28

Snell & Wilmer

L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

23.   Copies of all pleadings and orders served upon the removing Defendant in state court are attached as exhibits hereto, pursuant to 28 U.S.C. § 1446(a).

WHEREFORE, Webworks prays that the above-entitled action by removed to the United States District Court for the Eastern District of California.

Dated: December 18, 2009                    SNELL & WILMER L.L.P.


                                    By://s// Sean M. Sherlock
                                    ─────────────────────────
                                        Sean M. Sherlock
                                        Attorneys for Defendant
                                        PACIFIC WEBWORKS, INC.

CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2009, I filed the foregoing NOTICE OF REMOVAL electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alan Himmelfarb
Kamber Edelson, LLP
2757 Leonis Boulevard
Vernon, California 90058
ahimmelfarb@kamberedelson.com

Will Haselden
Christopher Dore
Kamber Edelson, LLC
350 North LaSalle, Suite 1300
Chicago, Illinois  60654
whaselden@kamberedelson.com
cdore@kamberedelson.com

//s// Wendy J. Merkle
Wendy J. Merkle

Snell & Wilmer
L.L.P.
LAW OFFICES
15 West South Temple, Suite 1200, Beneficial Tower
Salt Lake City, Utah 84101-1004
(801) 257-1900

# EXHIBIT A

NOV-12-2009 16:36   FROM:DELTA ONE SECURITY   17075525044          TO:17074258755          P.6/14

ENDORSED FILED
SOLANO SUPERIOR COURT

09 NOV 12 PM 3:10

BY_____
A ABUEG
DEPUTY CLERK

1   Alan Himmelfarb (SBN 90480)
2   KAMBEREDELSON, LLP
    2757 Loonis Boulevard
3   Vernon, California 90058
    Telephone; (323) 585-8696
4

5   ATTORNEYS FOR PLAINTIFFS

6          SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                        COUNTY OF SOLANO

8   DEANNA PELLETIER, an individual, on her
9   own and on behalf of all others similarly situated.      Case No.  FCS0 34684

10          Plaintiff,                          CLASS ACTION COMPLAINT
                                                AND JURY DEMAND
11   v.

12   PACIFIC WEBWORKS, INC., a Nevada         ASSIGNED TO
13   corporation, and JOHN DOE DEFENDANT,     JUDGE Ramona Garrett
                                              FOR ALL PURPOSES
14          Defendants,                       EFFECTIVE 01/04/2010
15   _____

16       CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

17       Plaintiff, Deanna Pelletier, brings this Class Action Complaint against Defendant

18   Pacific WebWorks, Inc. and John Doe Defendant (hereinafter collectively referred to in the

19   singular as "Defendant") based upon Defendant's practice of deceptively billing Plaintiff and

20   similarly-situated others for unauthorized charges. Plaintiff, for her Class Action Complaint,

21   alleges as follows upon personal knowledge as to herself and her own acts and experiences

22   and, as to all other matters, upon information and belief, including investigation conducted

23   by her own attorneys.

24                            Parties

25   1.      Plaintiff Deanna Pelletier is a California resident residing in Vacaville, California.

26   2.      Defendant Pacific WebWorks is an online provider of work-at-home products

27   marketed to consumers nationwide.   Pacific WebWorks is a Nevada corporation

28   _____
     Complaint

                                    111M210272257.W - 11/12/2009 3:51:08 PM

1    headquartered in and having its principal place of business at 230 West 400 South, 1st Floor,

2    Salt Lake City, Utah 84101.

3    3.      John Doe Defendant is an online advertising network that participates in the acts and

4    practices that are the subject of Plaintiff's complaint. John Doe Defendant participated in the

5    deceptive acts and practices that victimized Plaintiff. On information and belief, John Doe

6    Defendant is one of the following corporations or corporate d/b/a's: (1) Tracking202, Inc.;

7    (2) Media Trust LLC (Advaliant); (3) CyberPlex Inc. (CX Digital Media); (4) Coleadium,

8    Inc. (Ads4Dough); (5) JAR Media LLC; (6) Sybtrack.com; (7) eSynergy Media LLC; (8) W4

9    Media LLC; (9) Bskytracking.com; (10) GMB Direct, Inc.; (11) Elite Clicks Media LLC;

10    (12) Tracklead.net; (13) Track606.com; (14) Intermark Communications, Inc. (Copeac); (15)

11    Zoomleads.net; (16) Venture Incorporated (Neverblue); (17) Lidango; and (18)

12    Convert2Media LLC.

13    **Jurisdiction and Venue**

14    4.      This Court has jurisdiction over the causes of action asserted herein pursuant to the

15    California Constitution, Article VI, §10, because this case is a cause not given by statute to

16    other trial courts.

17    5.      This Court has jurisdiction over Defendant pursuant to California Code of Civil

18    Procedure section § 410.10 because it conducts substantial business in the State of California

19    and/or many of Defendant's wrongful acts directly affect California residents like Plaintiff.

20    6.      Venue is proper in this Court pursuant to the California Code of Civil Procedure

21    section (what?) because Plaintiff resides in Solano County.

22    **Facts Common to All Counts**

23    7.      With unemployment rising and wages stagnant, Americans are suffering through the

24    worst economy in decades. In these hard times, ordinary consumers are more than ever

25    subjected to a proliferation of work-at-home offers that promise the ability to easily make

26    thousands of dollars from at-home businesses.

27

28

Complaint

2

8.      The offers hosted by Defendant Pacific WebWorks state that consumers will work directly with and be well-paid by the giant web search engine Google.  The ability to work for this enormously successful company reasonably supports the promise of good income described in the offers from Defendant.

9.      Defendant's offers begin as initial representations made through a common deceptive scheme, constituting spam email offers, sponsored links, banner ads on internet search pages, and links in fake news articles and fake blogs.  The purpose of each of these initial representations is to drive consumer traffic to credit card submit landing pages at which a purchase can be made.

10.     These sponsored links, banner ads, fake news articles, and similar methods of gaining a consumer's attention are created and operated by a group of affiliate marketers and ad networks whose sole objective is to drive traffic to merchant landing pages such as those selling Defendant Pacific WebWorks's products.  John Doe Defendant acts in this space as an ad network and/or affiliate marketer, and in that capacity, actively drives traffic to Pacific WebWorks websites for its own monetary gain.

11.     Defendant Pacific WebWorks and John Doe Defendant work together to "optimize" transaction pages so as to drive ever-higher rates of purchase.  Both are motivated to take this active role because the sales revenue generated on a Pacific WebWorks site is the only way that both Pacific WebWorks and the upstream ad networks are compensated.  Therefore, the John Doe Defendant has a vested interest in not only directing consumers to the product page, but also ensuring and actively inducing the consumer to actually purchase the product.  This optimization can include changing the design of ad pages in the order path including the color, words used, placement of words, font size, placement of the Terms of Service, and the use of such "pressures" as phrases like "You Qualify for Instant Access!" and "…these kits are going FAST!," or the use of running timers counting down the minutes left before an

Complaint

3

1   offer "expires."  Such pressures are simply fabrications and are dynamically inserted into the

2   website at specified screen locations to further drive sales.

3   12.     As a primary inducement, consumers are often simply responding to the many initial

4   representations and screenshots that appear to state a relationship with Google itself.  The use

5   of Google's name in this manner, and specifically the prospect of working for one of the

6   world's most successful companies, appears as a primary non-price inducement to

7   deceptively entice consumers to purchase the Pacific WebWorks product.

8   13.     After a consumer is directed by a John Doe Defendant to a Pacific WebWorks

9   landing page displaying a work-at-home offer, Defendant pushes a product, often a CD or

10   software kit, purportedly designed to enable consumers to "Earn up to $978 or more a day

11   using GOOGLE," "Work from Home & learn to make $1000s a day using GOOGLE!," and

12   "Anyone with a computer and basic typing skills can make money using Google!"

13   14.     These landing pages typically contain language describing their offering  "As seen

14   on: Fox News, CNN," and "USAToday."  The website prominently features network logos

15   without license from these media entities and are plainly designed to suggest to a consumer

16   that the offering is supported by a reputable entity.  Pacific WebWorks products have never

17   been "seen on" or endorsed by any of the networks claimed on the website.

18   15.     The initial landing page seen by a consumer is bright and welcoming, and promises

19   "FAST CASH USING GOOGLE" and "HOME INCOME USING GOOGLE," among other

20   pleasing inducements.  Representations that drive consumers to these landing pages promise

21   "$7500 a month Working from Home Job: requires basic computer skills."  Banner ads even

22   promise "scam free" offers that link to landing pages used by Defendant on which consumers

23   are promised Pacific WebWorks products at prices that are not, in fact, remotely close to the

24   actual price charged by Pacific WebWorks.

25   16.     Defendant's landing pages contain a testimonial photo of a consumer that benefited

26   from Defendant's product.  In fact, this photo is a fake, inasmuch as Defendant simply uses a

27

28

Complaint

4

1    stock photo (commonly available at websites like iStockPhoto.com) and fabricates the

2    testimonial.

3        17.    In furtherance of the deception, Defendant's landing pages may be reached from

4    embedded links in fake blog testimonials ("flogs") and fake news articles with, again, stock

5    photos and testimonials purportedly representing actual consumers from one's own city or

6    state.  These consumers relate stories of terrific success using the Pacific WebWorks product.

7    Examples of these flogs and fake news articles deceptively used to sell Pacific WebWorks's

8    products are:

9            a.    "USA Online Journal-Finance News" in which "Mary Steadman"[1] tells how

10   she "quit her boring job as a manufacturer's representative" and "now makes $6,500+ a

11   month" using Pacific WebWorks products.

12           b.    "Consumer Weekly," in which the same "Mary Steadman," now portrayed as

13   "Elaine Love," also lost her "boring" manufacturing job and now makes thousands using

14   Pacific WebWorks products.

15

16

17

18   [1] "Mary Steadman," the most widely used fake person in fake news articles selling work-at-
     home products, is also featured on the following fake news sites, and at least 90 more
19   websites all across the internet:

20   www.SanFrancisco-Tribune.com, www.SanFranCiscoCityHearld.com, www.Sandiego-
     Tribune-News.com, www.SanDiego-Tribune.com, www.SanJose-Herald.com,
21   www.SanJose-Times.com, www.TheLosAngelesJournal.com,
     www.LosAngelesTribuneNews, www.LosAngelesNews7.com,
22   www.LosAngelesFinanceNews.com, www.Los-Angeles-Weekly.com,
     www.LosAngelesDispatch.com, www.4KAWeekIn3Steps.com, www.Action7Journal.com,
23   www.AmericaFinanceNews.com, www.AmericaJobJournal.com,
     www.AmericaNewsDaily.com, www.B12-Media.com, www.BargainBoomer.com,
24   www.Best-Job-In.com, www.BirmingHamTribune.co.uk, www.Boston-BusinessNews.com,
     www.Boston-Tribune.com, www.BostonFinanceNews.com, www.BostonGazetteNews.com,
25   www.OrlandoWebTimes, www.ReadSomeNews.com, www.Online-Job-News.com,
     www.NYGazetteNews.com,
26   www.NewYorkPostHearld.com,www.NewYorkPostHearld.com.

27

28   _Complaint_

                                            5

1    c.    "Chicago Job News" at which "Jerry Reynolds" describes how he "lost his

2 boring job as an account representative for a manufacturing company" and "now makes

3 $5,500+ a month just by submitting small text ads online on Google."

4    d.    "Scott Hunter" on "wthguide.info," a fake blog that states how Mr. Hunter

5 also "lost his job as a boring account representative for a manufacturing company." "Scott"

6 makes "$9,000+ a month just by submitting small text ads on Google." Upon information

7 and belief, "Scott Hunter" is the pseudonym of an affiliate marketer driving traffic to a

8 Pacific WebWorks site.

9 18.    Defendant Pacific WebWorks also derives sales from online traffic routed through

10 fake consumer review sites.  At these sites, alleged "advocates" for consumers endorse

11 PacificWebWorks's products with laudatory language and within the body of the fake

12 reviews link to deceptive transaction pages for those products.

13 19.    The online order path leading to Defendant's transaction pages are littered with

14 pictures of individuals that testify to the success they have enjoyed using Pacific

15 WebWorks's product. The individuals in Defendant's fake photos are not from the

16 consumer's city or state; in fact, the specific locale represented is dynamically generated by

17 instructions contained in the underlying source code for the screen page presented.  That is,

18 "Sara Stanley" from "Sacramento" is in fact simply a fictitious person whose city name is

19 generated by source code that recognizes and responds to the (Sacramento) IP address of the

20 consumer's computer.

21 20.    A consumer is required to give Pacific WebWorks certain "personally identifying

22 information" (PII) to "CHECK AVAILABILITY" of this "LIMITED TIME OFFER!"  A

23 consumer's submission of her PII enables Pacific WebWorks to sell this information to other

24 marketers of goods and products.  Thus, a consumer actually does not have to "qualify" for

25 anything, but is instead submitting to a lead generation process by which their PII (a "lead")

26 is monetized by Pacific WebWorks and the consumer unknowingly "consents" to the receipt

27

28

Complaint

6

1  of additional email offers from an untold number of merchants, *i.e.*, anyone to whom Pacific

2  WebWorks can sell this information.

3  21.     The product offered by Pacific WebWorks is promised at the minimal price of $2.00

4  or less, which is represented as covering all costs of the product.

5  22.     Importantly, in order to cover this small charge, Pacific WebWorks requires that

6  consumers give it a credit card number.

7  23.     A consumer's credit card number is entered into a credit card submit field on an

8  online transaction page (the transaction page most often directly follows the landing page –

9  the order path may be understood as starting with the initial representation that drives traffic

10  to the landing path where a consumer's PII is taken.  A billing or transaction page completes

11  the online order path).

12  24.     Materially, the only price representation clearly and conspicuously displayed on the

13  credit card submit page or in proximity to the credit card submit box is a line that states

14  "**Total: $1.97.**"

15  25.     Calls to action like "LIMITED TIME OFFER!" and "WORK FROM HOME, SET

16  YOUR OWN HOURS, THEN LIVE YOUR LIFE!" are found on these pages.  These

17  phrases are part of a static background image that are saved and displayed every time the

18  page loads on a consumer's browser.

19  26.     Compelling phrases including "Satisfaction Guaranteed," and "100% Trusted!"

20  appear in large print scattered about the page.

21  27.     Ultimately, a consumer reasonably understands that ordering the Pacific WebWorks

22  product is an action that will cause them to incur a small charge on their credit card.  In fact,

23  this small price is simply bait for a credit card number that can then be used to impose

24  additional charges on the consumer.

25

26

27

28

Complaint                                                  7

28.    Though the actual price of a product is always material, Defendant hides the real price of its product in small print on or under the transaction page or simply does not disclose it at all on this checkout page.

29.    By simply submitting credit card information to Pacific WebWorks in payment of the discounted fee of $1.97 (Defendant also offers identical products at $.97, $1.95, and $2.95), a consumer unwittingly agrees to a monthly recurring charge of $79.90 (also, in some instances, $69.90) for access to a program purportedly containing information that enables a consumer to "Start Making Money Today!"

30.    Materially, and wholly absent any clear and conspicuous price disclosure, consumers may also find that they have been billed $24.90 by Defendant for another, unknown product. This charge is recurring in that it appears every month on a consumer's bill. This undisclosed negative option, deceptively tied to a consumer's agreement to pay a small amount for a Pacific WebWorks product, is charged to consumers entirely without their authorization.

31.    Thus, a consumer reasonably expecting to pay $1.97 for a Pacific WebWorks product will be charged that sum plus:  1) $79.90, and 2) $24.90 a month for as long as the consumer fails to notice this charge and object to it.

32.    Only the charge of $1.97 is clearly and conspicuously disclosed to a consumer responding to an offer from Defendant.

33.    Pacific WebWorks acts with John Doe Defendant to drive traffic to, promote, and sell its work-at-home product.  Correspondingly, all Defendants optimize and continually oversee the creation of the deceptive advertisements concealing material terms and conditions, described herein, and all receive significant revenue from the sale of each poorly-disclosed Pacific WebWorks product.

Complaint

8

1  34.    Defendant knows or should know that these ads and offers violate clearly established

2  laws requiring, among other seminal concerns, that all material purchase terms be clearly and

3  conspicuously disclosed to consumers.

4  35.    Although Defendant uses a number of specific paths and representations for their

5  deception, each order path has a core, common underpinning, namely that a consumer will

6  only be charged $1.97 for a work at home product sold by or directly associated with Google.

7  **Facts Relating to the Plaintiff Deanna Pelletier**

8  36.    During the relevant period, Plaintiff Deanna Pelletier received an email solicitation

9  advertising a Google work-at-home opportunity.  Plaintiff is currently unemployed and

10  receiving social security disability payments as her primary source of income.  Plaintiff

11  clicked on a link within that email message that took her to what appeared to be a news

12  article describing the life-changing experience of a woman that utilized a Pacific WebWorks

13  product to make $5,000.00 a month.  This site contained a link to the PII landing page

14  described above and from which Plaintiff reasonably understood that she could receive the

15  Pacific WebWorks product (Google Business Kit) for $1.97.  Plaintiff reasonably believed

16  that this was a Google offer.

17  37.    Plaintiff did not know that Google itself has nothing to do with this product nor did

18  Plaintiff reasonably understand that, by agreeing to pay Defendant $1.97, she also

19  "consented" to be billed for unrevealed products or services at an undisclosed price for an

20  ongoing period.

21  38.    Plaintiff only authorized Defendant to bill her credit card the charge of $1.97.

22  Nevertheless, and wholly without authorization from Plaintiff, Pacific WebWorks took from

23  Plaintiff an additional $79.90.

24  39.    Plaintiff called repeatedly to request a refund.  Plaintiff finally did speak with a

25  representative and Plaintiff told Defendant's representative that she 1) never authorized

26

27

28

Complaint

9

1  Pacific WebWorks to bill her card the sum of $79.90, 2) never received the Google Kit, and

2  3) wanted to cancel her order and receive a refund of the unauthorized charge of $79.90.

3  40.    Plaintiff told the Pacific WebWorks representative that she would not have agreed to

4  pay $79.90 for this product if she would have clearly understood that this was the actual price

5  for the product offered.  Nevertheless, despite her vehement assertions that she should not be

6  charged this price, Defendant refused to give Plaintiff a refund of this money.

7  41.    Incredibly, after this conversation with Defendant's representative, Plaintiff has also

8  been charged the additional sum of $24.90 each month by Pacific WebWorks.  Plaintiff does

9  not know what this charge is for and has called Pacific WebWorks repeatedly in an effort to

10  also have this charge removed from her credit card bill.  Plaintiff has been assured by various

11  Pacific WebWorks's representatives that this charge will be removed.  Despite these

12  assurances, Plaintiff continues to be charged $24.90 each month by Pacific WebWorks.

13  42.    Plaintiff has *not* been given a refund from Pacific WebWorks.

14  **Amount in Controversy**

15  43.    Plaintiff makes no specific allegation that the amount in controversy (including

16  requests for attorneys' fees, injunctive relief, etc.) exceeds any specific amount.  Specifically,

17  Plaintiff makes no allegations that the amount in controversy exceeds $5,000,000.

18  **Class Allegations**

19  44.    Plaintiff brings this action pursuant to Code of Civil Procedure § 382 on behalf of

20  herself and a Class and one SubClass:

21  **Pacific WebWorks Class:** Plaintiff brings this action on behalf of herself and a Class

22  of similarly situated individuals, defined as follows:

23  all California residents who submitted payment information to a Pacific WebWorks
website for the purpose of obtaining Pacific WebWorks's products or services, and

24  who were charged any amount other than a stated shipping and handling or
discounted fee.

25  **John Doe Defendant SubClass:** Plaintiff brings this action on behalf of herself and

26  a SubClass of similarly situated individuals, defined as follows:

27

28

Complaint                                          10

all California residents who submitted credit card information to a Pacific WebWorks website for the purpose of obtaining Pacific WebWorks's products or services, who were charged any amount other than a stated shipping and handling or discounted fee, and that were traceably driven to a Pacific WebWorks website(s) by John Doe Defendant, or affiliate marketers acting through or in conjunction with John Doe Defendant.

The following people are excluded from the Class and SubClass: 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; and 3) persons who properly execute and file a timely request for exclusion from the class and 4) the legal representatives, successors or assigns of any such excluded persons.

45.     Hereinafter, the above-described Class and SubClass shall be stated as "Classes" for purposes of this Complaint.

46.     **Numerosity:** The exact number of the members of the Classes is unknown and not available to Plaintiff, but it is clear that individual joinder is impracticable, in satisfaction of Code of Civil Procedure § 382. On information and belief, Defendant has deceived thousands of consumers who fall into the definitions set forth in the Class and SubClass. All members of the Classes can be identified through Defendant's records.

47.     **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendant, based upon the same transactions which were uniformly made to Plaintiff and the public.

48.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

Complaint

11

49.     **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant. It would be virtually impossible for the individual members of the Classes to obtain effective relief from the misconduct of Defendant. Even if members of the Classes themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

50.     **Commonality:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to the following:

(a)     Whether Defendant's conduct described herein violates the False Advertising Law (Cal. Bus. & Prof. Code Sections 17500, *et seq.*), prohibiting deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service;

(b)     Whether Defendant's conduct described herein violates the Consumers Legal Remedies Act (California Civil Code Sections 1750, *et seq.*), prohibiting the act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise,

Complaint

12

misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby;

(c)   Whether Defendant's conduct described herein violates the Unfair Competition Law (Cal. Bus. & Prof. Code Sections 17200, *et seq.*), which protects both consumers and competitors by promoting fair competition in commercial markets for goods and services and prohibits any unlawful, unfair or fraudulent business act or practice;

(d)   Whether Defendant's conduct described herein results in unjust enrichment to Defendant.

(e)   Whether Defendant's conduct described herein results in a breach of contract.

## COUNT I
### Violation of the False Advertising Law
### California Businessand Professions Code Sections 17500, *et seq.*
### (On Behalf of Plaintiff and the Classes)

51.   Plaintiff incorporates by reference the foregoing allegations.

52.   Cal. Bus. & Prof. Code  § 17500 provides that it is unlawful for any corporation to knowingly make, by means of any advertising device or otherwise, any untrue or misleading statement with the intent to sell a product or service, or to induce the public to purchase a product or service.  Any statement in advertising that is likely to deceive members of the public constitutes false and misleading advertising under Cal. Bus. & Prof. Code § 17500.

53.   As described within, Defendant has disseminated, and continues to disseminate advertising that it knows or should reasonably know is false and misleading. This conduct includes, but it not limited to, promoting and advertising "work-at-home" products without

Complaint

13

1   disclosing the actual price, a material term of any transaction.  Defendant actively

2   misrepresents and conceals the actual price(s) consumers are charged when they submit their

3   credit card information.

4   54.   By committing the acts alleged in this Complaint, Defendant has knowingly

5   disseminated untrue and/or misleading statements through online advertising in order to sell

6   or induce members of the public to purchase work-at-home products, in violation of Cal.

7   Bus. & Prof. Code § 17500.

8   55.   Plaintiff and members of the Classes were all charged monies beyond what they

9   authorized.  Accordingly, Plaintiff and members of the Classes have suffered injury in fact

10   and lost money as a result of Defendant's acts of false advertising.

11   56.   Plaintiff seek an order requiring Defendant to (1) immediately stop the unlawful

12   practices stated in this Complaint; (2) make full restitution of all funds wrongfully obtained;

13   and (3) pay interest, attorney's fees, and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

14   

15   **COUNT II**
**Violation of the Consumers Legal Remedies Act**
**California Civil Code Sections 1750,** *et seq.*
**(On Behalf of Plaintiff and the Classes)**

16   

17   57.   Plaintiff incorporates by reference the foregoing allegations.

18   58.   The Consumers Legal Remedies Act prohibits the act, use or employment by any

19   person of any deception, fraud, false pretense, false promise, misrepresentation, concealment,

20   suppression or omission of any material fact with intent that others rely upon such act in

21   connection with the sale or advertisement of any merchandise whether or not any person has

22   in fact been misled, deceived or damaged thereby.

23   59.   As described within, Defendant has engaged in deceptive practices, unlawful methods

24   of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750, *et seq.*, to the

25   detriment of Plaintiff and the Classes.

26   

27   

28   

Complaint

14

60.   Defendant utilizes false and deceptive advertising that both conceals the actual price of the product and widely and willfully misrepresents testimonial support for the product offered.

61.   Defendant's offers contain unconscionable terms in that they are unfair and inequitable and the material terms of the offers are hidden and actively misrepresented by Defendant.

62.   Defendant, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Classes by deceptively inducing the Plaintiff and all members of the Class and SubClass to purchase a product with deceptive and misleading advertisements by failing to clearly and conspicuously disclose the price of the goods and services and by placing unauthorized charges on their credit card accounts.  Specifically, Defendant violated Cal. Civ. Code § 1750 in at least the following respects:

   (a)      In violation of § 1770(a)(2) by misrepresenting the source, sponsorship, approval, or certification of Defendant's goods or services;

   (b)      In violation of § 1770(a)(3) by misrepresenting the affiliation, connection, or association with, or certification by, a third party in relation to Defendant's products;

   (c)      In violation of § 1770(a)(9) by advertising Defendant's goods or services with the intent not to sell them as advertised;

   (d)      In violation of § 1770(a)(13) by making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions related to Defendant's good or services;

   (e)      In violation of § 1770(a)(14) by Defendant's acts and omissions in representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

   (f)      In violation of § 1770(a)(19) by inserting an unconscionable provision in

Complaint

15

the offer for Defendant's goods and services;

63.    Plaintiff and the Classes have suffered harm as a proximate result of the violations of law and wrongful conduct of the Defendant.

64.    Under Cal. Civ. Code § 1780(a) and (b), Plaintiff and the Classes seek injunctive relief requiring Defendant to cease and desist the illegal conduct stated in this Complaint, and any other appropriate remedy for violations of the CLRA. For the sake of clarity, Plaintiff explicitly disclaims any claim for damages under the CLRA at this time.

**COUNT III**
**Violation of the Unfair Competition Law**
**California Business and Professions Code Sections 17200, et seq.**
**(On Behalf of Plaintiff and the Classes)**

65.    Plaintiff incorporates by reference the foregoing allegations.

66.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

67.    The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A business practice need only meet one of the three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and that at the same time is forbidden by law. A fraudulent business practice is one in which members of the public are likely to be deceived.

68.    As described within, Defendant's continued utilization of unlawful and unconscionable marketing practices, and the continuing practice of charging consumers credit cards without authorization, constitutes an unlawful and unfair business practice in violation of Cal. Bus. & Prof. Code §§ 17200, et seq.

69.    In deceiving Plaintiff and the Classes by creating and supporting advertising that fails to clearly and conspicuously disclose the actual price of its products, and inducing Plaintiff and members of the Class and SubClass to proffer payment information based on that

Complaint

16

1  misrepresentation, Defendant has engaged in deceptive trade practices in violation of Cal.

2  Bus. & Prof. Code §§ 17200, *et seq.*

3  70.     The price of a consumer product is a material term of any transaction because it is

4  likely to affect a consumer's choice of, or conduct regarding, whether to purchase a product.

5  Any deception related to the price of a consumer product is materially misleading.

6  71.     Defendant's misrepresentation of the price of its products is likely to mislead a

7  reasonable consumer who is acting reasonably under the circumstances.

8  72.     Defendant has violated the "unfair" prong of the UCL in that its actions caused

9  substantial injury to consumers by charging their credit cards without their consent after

10  inducing them to submit their information through deceptive marketing.  The injury caused

11  by Defendant's conduct is not outweighed by any countervailing benefits to consumers or

12  competition, and the injury is one that consumers themselves could not reasonably have

13  avoided.

14  73.     Defendant has violated the "fraudulent" prong of the UCL in that its statements,

15  advertisements, and representations regarding what consumers would be charged for its

16  products are false and likely to deceive a reasonable consumer.

17  74.     Defendant has violated the "unlawful" prong of the UCL in that Defendant's conduct

18  violated the Consumer Legal Remedies Act (Cal. Bus. & Prof. Code  § 1750 *et seq.*) and the

19  False Advertising Law (Cal. Bus. & Prof. Code  § 17500 *et seq.*).

20  75.     Plaintiff and the Classes have suffered harm as a proximate result of the violations of

21  law and wrongful conduct of Defendant.

22  76.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order of this Court

23  permanently enjoining Defendant from continuing to engage in unfair and unlawful conduct.

24  77.     Plaintiff seeks an order requiring Defendant to (1) immediately stop the unlawful

25  practices stated in this Complaint; (2) make full restitution of all funds wrongfully obtained;

26  and (3) pay interest, attorney's fees, and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

27

28

Complaint

17

## COUNT IV
### Restitution/Unjust Enrichment
### (On Behalf of the Plaintiff and the Classes)

78.     Plaintiff incorporates by reference the foregoing allegations.

79.     Plaintiff and members of the Class and SubClass conferred a monetary benefit on Defendant. Defendant has received and retained money belonging to Plaintiff and the Classes resulting from substantial and unauthorized charges placed on their credit card bills by Pacific WebWorks. Defendant profits from each individual purchase made by a consumer after being directed to Pacific WebWorks's transaction pages.

80.     Defendant appreciates or has knowledge of such benefit.

81.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and members of the Classes, which Defendant has unjustly received as a result of its unlawful actions.

82.     Plaintiff and other members of the Classes suffered damages as a direct result of Defendant's conduct.

83.     Plaintiff, on her own behalf, and on behalf of the Classes, seeks restitution for Defendant's unlawful conduct, as well as interest and attorney's fees and costs.

## COUNT V
### Breach of Contract
### (On Behalf of Plaintiff and the Pacific WebWorks Class)

84.     Plaintiff incorporates by reference the foregoing allegations.

85.     In reliance upon Defendants' misrepresentations and deceptive advertising, Plaintiff entered into a contract to receive a product from Pacific WebWorks at a genuinely discounted price, or for the cost of shipping and handling only. Because of these deceptive misrepresentations, Plaintiff and the Pacific WebWorks Class entered their credit card information with the understanding that they would only be charged a genuinely discounted price or the cost of shipping and handling in exchange for a product from Pacific WebWorks.

86.     By cramming additional undisclosed charges on the credit/debit cards of Plaintiff and the members of the Pacific WebWorks Class, Pacific WebWorks breached the contract for

Complaint

18

**COUNT IV**
**Restitution/Unjust Enrichment**
**(On Behalf of the Plaintiff and the Classes)**

78. .    Plaintiff incorporates by reference the foregoing allegations.

79.    Plaintiff and members of the Class and SubClass conferred a monetary benefit on Defendant. Defendant has received and retained money belonging to Plaintiff and the Classes resulting from substantial and unauthorized charges placed on their credit card bills by Pacific WebWorks. Defendant profits from each individual purchase made by a consumer after being directed to Pacific WebWorks's transaction pages.

80.    Defendant appreciates or has knowledge of such benefit.

81.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and members of the Classes, which Defendant has unjustly received as a result of its unlawful actions.

82.    Plaintiff and other members of the Classes suffered damages as a direct result of Defendant's conduct.

83.    Plaintiff, on her own behalf, and on behalf of the Classes, seeks restitution for Defendant's unlawful conduct, as well as interest and attorney's fees and costs.

**COUNT V**
**Breach of Contract**
**(On Behalf of Plaintiff and the Pacific WebWorks Class)**

84.    Plaintiff incorporates by reference the foregoing allegations.

85.    In reliance upon Defendants' misrepresentations and deceptive advertising, Plaintiff entered into a contract to receive a product from Pacific WebWorks at a genuinely discounted price, or for the cost of shipping and handling only. Because of these deceptive misrepresentations, Plaintiff and the Pacific WebWorks Class entered their credit card information with the understanding that they would only be charged a genuinely discounted price or the cost of shipping and handling in exchange for a product from Pacific WebWorks.

86.    By cramming additional undisclosed charges on the credit/debit cards of Plaintiff and the members of the Pacific WebWorks Class, Pacific WebWorks breached the contract for

Complaint

18

1   the purchase of a product at the clearly disclosed price described above.  Plaintiff and the

2   members of the Pacific WebWorks Class did not assent to any additional charges and did not

3   reasonably expect that the contract for purchase and sale would include such additional

4   charges.

5   87.     At all times relevant to this action, Pacific WebWorks acted willfully and with the

6   intent to breach the contracts they entered into with Plaintiff and the Pacific WebWorks

7   Class.

8   88.     Plaintiff and the Pacific WebWorks Class have suffered damages as a direct result of

9   Pacific WebWorks's acts and practices in the form of monies paid and lost.

10   89.     Plaintiff, on her own behalf, and on behalf of the Pacific WebWorks Class, seek

11   damages for Defendant's breach of contract, as well as interest and attorney's fees and costs

12   pursuant to Cal. Code Civ. Proc. § 1021.5.

13

14   WHEREFORE, Plaintiff Deanna Pelletier on behalf of herself and members of the Class

15   and SubClass, pray for the following relief:

16          a.      Certify this case as a class action on behalf of the Class and SubClass as

17   defined above and appoint Deanna Pelletier as class representative and undersigned counsel

18   as lead counsel of this class action;

19          b.      Enter judgment against Pacific WebWorks and John Doe Defendant, Inc. for

20   all monetary, actual, consequential, and compensatory damages caused by its unlawful

21   conduct;

22          c.      Award Plaintiff and the Classes civil penalties and/or punitive damages for

23   violations of the above-cited statutes and law. (For the sake of clarity, Plaintiff explicitly

24   disclaims any claim for damages under the CLRA at this time.)

25          d.      Award Plaintiff and the Classes reasonable costs and attorneys' fees;

26          e.      Award Plaintiff and the Classes pre- and post-judgment interest;

27

28

Complaint

19

1      f.     Enter judgment for injunctive, statutory and/or declaratory relief as is

2 necessary to protect the interests of Plaintiff and the Classes; and,

3      g.     Award such other and further relief as equity and justice may require.

4

5                  **JURY DEMAND**

6

7        Plaintiff requests trial by jury of all claims that can be so tried.

8

9  Dated:  November 12, 2009             KAMBEREDELSON, LLP

10                       By:

11                         Alan Himmelfarb
                         One of the Attorneys for DEANNA

12                         PELLETIER, individually and on behalf
                         of a class of similarly situated individuals

13

14  Alan Himmelfarb (SBN 90480)

15  KAMBEREDELSON, LLP
    2757 Leonis Boulevard

16  Vernon, California 90058
    Telephone: (323) 585-8696

17

18  Will Haselden
    FL Bar No.  0072011

19  (*pro hac vice* motion to be filed)
    Christopher Dore

20  IL Bar No. 6299670
    (*pro hac vice* motion to be filed)

21  KAMBEREDELSON, LLC
    350 North LaSalle, Suite 1300

22  Chicago, Illinois 60654
    Telephone: (312) 589-6370

23  whaselden@kamberedelson.com
    cdore@ kamberedelson.com

24

25

26

27

28  Complaint

                          20

EXHIBIT B

NOV-12-2009 16:38  FROM:DELTA ONE SECURITY   17075525044      TO:17074258755        P.14/14

**SUMMONS**
*(CITACION JUDICIAL)*

ASSIGNED TO
JUDGE _Ramona Garrett_
FOR ALL PURPOSES

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PACIFIC WEBWORKS, INC., a Nevada corporation, and JOHN DOE
DEFENDANT,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

DEANNA PELLETIER, an individual, on her own and on behalf of all
others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

[body instructional paragraphs in English and Spanish]

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Solano Justice Center, Civil Clerk's Office, 321 Tuolumne Street,
Vallejo, CA 94590

CASE NUMBER: *(Número del Caso)* FCS034684

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Alan Himmelfarb, KAMBEREDELSON LLP, 2757 Leonis Blvd., Los Angeles, CA 90058, (323) 585-8696

DATE: 11/12/2009
*(Fecha)*        Clerk, by   J. ABUEG   , Deputy
                 *(Secretario)*          *(Adjunto)*

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☐ on behalf of (specify):
   under ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
         ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
         ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
         ☐ other (specify):
4. ☐ by personal delivery on (date):

**SUMMONS**

Notice of Removal    32

EXHIBIT C

Sean M. Sherlock (CA 161627)
Snell & Wilmer L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, California, 92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799

*Attorneys for Pacific Webworks, Inc.*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Deanna Pelletier,<br><br>        Plaintiff,<br><br>vs.<br><br>Pacific WebWorks, Inc.,<br><br>        Defendant. | CASE NO.<br><br>**DECLARATION OF KENNETH W. BELL**<br>**IN SUPPORT OF NOTICE OF REMOVAL**<br><br>DATE OF FILING:  No Date Set |

I, Kenneth W. Bell, hereby declare that the following are true and accurate to the best of my knowledge, information, and belief:

1.      I am currently the CEO of Pacific Webworks and have held that position since January 2001. I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      On November 20, 2009, Pacific Webworks was served with a complaint seeking class certification for those customers of Pacific Webworks residing in the State of California.

3.      After reviewing the Complaint, my staff and I made some determinations about the potential impact of class action litigation on Pacific Webworks' business. These determinations were based on the allegations in the Complaint, are not concessions that the Plaintiffs are entitled to recover any amount alleged, and should not be construed as an admission of liability.

4.      Founded in 1997, Pacific Webworks is a Nevada company, with its headquarters located in Salt Lake City, Utah.  Pacific Webworks conducts business nationally and develops business

software technologies and solutions for small and medium-sized businesses that want to use the internet as part of their business strategy. Pacific Webworks provides customers with a "one-stop" internet solution which includes tools for creating, managing, maintaining and hosting a website; electronic tools such as storefront hosting, shopping card and Internet payment systems; marketing tools such as automated customer databases and survey and email tools; and statistical reporting tools. In addition, Pacific Webworks provides excellent customer support and professional trainers and coaches.

5.      After reviewing the Complaint, I determined that the internet marketing campaign at issue in the Complaint began in April 2007.

6.      Between April 2007 and the present, Pacific Webworks has had a total of 84,150 customers who reside in the State of California.

7.      All of these customers in California paid for Pacific Webworks' products and services by credit or debit card and were charged the agreed upon fees.

8.      Pacific Webworks' primary means of attracting new customers has been through internet advertising and marketing. If the Court were to issue an injunction as sought by Plaintiffs and Pacific Webworks were required to halt its internet advertising and marketing or cease its recurring charges, its means of obtaining new or maintaining existing customers would essentially cease. Were this to occur, Pacific Webworks would then lose monthly revenues that I estimate to be approximately $1.4M.

I hereby declare under penalty of perjury that the foregoing statements are truthful and accurate in all material respects.

Dated this 17th day of December, 2009.

Kenneth W. Bell

EXHIBIT D



**C**Antitrust

Fall, 2006

Roundtable: Business Strategy and Antitrust

Development

U.S. Development

**\*45 EARLY RETURNS: IMPACT OF THE CLASS ACTION FAIRNESS ACT ON FEDERAL JURISDICTION OVER STATE LAW CLASS ACTIONS**

Gregory G. Wrobel, Michael J. Waters [FNa1]

Copyright © 2006 by American Bar Association; Gregory G. Wrobel, Michael J. Waters

THE CLASS ACTION FAIRNESS ACT (CAFA) became effective in February 2005. [FN1] In addition to other important changes in federal procedure and standards for settlements using coupons and cy pres relief, CAFA expanded federal diversity jurisdiction over state law class actions to promote removal and coordinated federal proceedings, particularly in the antitrust field for claims on behalf of indirect purchaser claims.

In a series of articles published in the Fall 2005 issue of ANTITRUST, the authors analyzed how CAFA may affect antitrust class actions. [FN2] Among the authors' predictions are: CAFA will cause class counsel to file more state law antitrust class actions in federal court [FN3]; CAFA will result in greater consolidation of related direct and indirect purchaser cases in one court [FN4]; the lack of a time limit for removal under CAFA may lead to eleventh-hour removal petitions [FN5]; and fewer coupon settlements would be proposed in federal courts. [FN6]

Federal courts have issued numerous decisions applying CAFA's provisions following publication of these articles, but more judicial experience and data are needed to fully assess these and other predictions. Many of these court decisions address how CAFA affects cases that were pending on CAFA's effective date. Several courts have devised discovery and other procedures to adjudicate CAFA-related remand disputes but none of these decisions addresses an eleventh-hour removal petition based on CAFA.

Researchers have begun to analyze preliminary data on post-CAFA class actions in federal courts, but more data and study is warranted to evaluate how CAFA is affecting class counsels' selection of a state or federal forum for state law class actions and the use of coupons and cy pres relief in class settlements. Such analysis may be useful to the Antitrust Modernization Commission (AMC) as it continues to debate whether further statutory changes are warranted to reconcile antitrust claims of direct and indirect purchasers. [FN7]

**Initial Court Decisions Addressing CAFA**

There have been approximately 34 circuit court decisions and over 165 district court decisions construing the Act. [FN8] Many of these decisions will have only benign effects on future class action litigation. Other decisions, as described below, address matters of continuing importance to CAFA's expanded federal diversity jurisdiction and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cv-03503-KJM-KJN   Document 1   Filed 12/18/09   Page 40 of 52

the process for adjudicating jurisdictional disputes, including issues such as commencement, burden, jurisdictional discovery, and exceptions to CAFA's expanded federal diversity jurisdiction.

*Commencement.* Predictably, the most widely litigated issue to date has been CAFA's applicability to pending cases. Section 9 of the Act states that CAFA applies only to cases commenced after the Act's effective date. Defendants have based removal petitions on various developments in pending cases, and courts have provided differing interpretations as to the changes in the complaint or named parties that are deemed to commence a new suit to which CAFA applies. Over time, this issue will diminish in importance as class actions pending on CAFA's effective date are fully litigated, settled, or dismissed. For the present, however, this issue may arise in any previously pending state court class action in which class counsel amends the complaint, files a new complaint, or adds or removes class representatives.

Many courts have applied the relation-back doctrine and held that various amendments did not commence a new suit in state court because the amended complaint does not substantively alter-and thus relates back to-the original complaint. [FN9] In applying this doctrine, the Seventh Circuit recently stated that "the criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." [FN10]

Several courts have addressed this issue in antitrust cases and applied the relation-back doctrine to hold that CAFA did not provide a basis for removal.

For example, in *Carpanelli v. American Standard Companies*, No. C 06-0004 WDB, 2006 WL 568307 (N.D. Cal. Mar. 3, 2006), an indirect purchaser price-fixing case, the court held that the relation-back doctrine applied to a consolidated*46 amended complaint because it did not substantively alter the nature of the plaintiffs' claims. [FN11] The court ruled that removal based on CAFA was improper because the case had commenced prior to CAFA's enactment and the Act does not apply to cases pending as of that date. [FN12]

Other courts have held that the addition of new parties commenced a new lawsuit. This occurs most often with the addition of new defendants. Courts reason that "a party brought into court by an amendment, and who has, for the first time, an opportunity to make defense to the action, has a right to treat the proceeding, as to him, as commenced by the process which brings him into court." [FN13]

Counsel who contemplate or are confronted with changes in the complaint or parties in pre-CAFA state court class actions should evaluate whether such changes may provide a basis for removal of the case to federal court, and whether such changes are warranted despite (or perhaps because of) the potential for removal. [FN14]

*Burden.* CAFA does not expressly state which party bears the burden of proving that, upon removal, the Act either does or does not provide a basis for federal jurisdiction. Courts have reached differing conclusions on this issue.

Several district courts have ruled that CAFA shifts the burden of proof to the plaintiff when removal is contested. The first court to reach this conclusion, *Berry v. American Express Publishing Corp.*, 381 F. Supp. 2d 1118 (C.D. Cal. 2005), reasoned that Congress intended to shift the burden to plaintiffs because CAFA "was clearly enacted with the purpose of expanding federal jurisdiction over class actions." *Id.* at 1122. The court noted that "determining legislative 'intent' is a process without the potential for selective interpretation," but concluded that "where the statute does not squarely address the issue, legislative history is an essential tool for statutory interpretation" and that committee reports may be consulted to discern legislative intent. *Id.* at 1121 (internal citations omitted).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The court found that the report of the Senate Judiciary Committee expressed an unequivocal intention to place the burden on the party opposing removal to show that federal jurisdiction is lacking and thus that remand is required:

> The Committee Report states that '[i]t is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption.' S. Rep. 109-14, p. 44; *see also* Sen. Rep. 109-14, p. 43 ('the named plaintiffs should bear the burden of demonstrating that a case should be remanded to state court ...').
> *Id.* at 1122.

In justifying its interpretation of legislative intent, the court stated: "[A]lthough the lack of any burden-shifting provisions may be an opaque means of preserving the status quo, as defendants suggest, it is equally possible that it was due to legislative oversight, the inability of the Legislature to foresee, or for statutes to address all circumstances." *Id.* The court found it is more plausible that "the failure to address the burden of proof in the statute reflects the Legislature's expectation that the clear statements in the Senate Report would be sufficient to shift the burden of proof." [FN15]

Contrary to *Berry*, the majority of courts addressing the burden controversy, including the only two courts of appeals to analyze the issue, [FN16] have applied the traditional rule that the removing party, as the proponent of federal jurisdiction, bears the burden of establishing that such jurisdiction exists. The Seventh Circuit, in *Brill*, was the first court of appeals to reach this conclusion with respect to a removal petition based on CAFA. The court rejected the report of the Senate Judiciary Committee as an expression of pertinent legislative intent:

> When a law sensibly could be read in multiple ways, legislative history may help a court understand which of these received the political branches' imprimatur. But when the legislative history stands by itself, as a naked expression of 'intent' unconnected to any enacted text, it has no more force than an opinion poll of legislators-less, really, as it speaks for fewer. Thirteen Senators signed this report and five voted not to send the proposal to the floor. Another 82 Senators did not express themselves on the question; likewise 435 Members of the House and one President kept their silence. [FN17]

In *Abrego*, the Ninth Circuit analyzed the traditional burden rule and agreed with the Seventh Circuit, holding that: "CAFA's silence, coupled with a sentence in a legislative committee report untethered to any statutory language, does not alter the longstanding rule that the party seeking federal jurisdiction on removal bears the burden of establishing that jurisdiction." 443 F.3d at 686.

***Jurisdictional Discovery.*** CAFA's legislative history suggests that "limited" jurisdictional discovery should be allowed in some instances, but that "these jurisdictional determinations should be made largely on the basis of readily available information." S. Rep. No. 109-14, at 44 (2005). The Senate Judiciary Committee explained that:

> Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of federal jurisdiction over class actions. For example, in assessing citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified. Less burdensome means (e.g., factual stipulations) should be used in creating a record upon which the jurisdictional determinations can be made.
> *Id.* at 42.

Thus far, although not relying solely on legislative history, courts have adhered to these recommendations and have only allowed discovery "sufficiently tailored" to lead to information concerning the jurisdictional issue.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

For example, in *Rippee v. Boston Market Corp.*, 408 F. Supp. 2d 982 (S.D. Cal. 2005), the court held that jurisdictional*47 discovery is permissible "when the Court is unable to determine, on the existing record, whether it has jurisdiction." *Id.* at 985. The court ordered the parties to engage in limited discovery over the course of ninety days on the issue of the amount in controversy. *Id.* at 985. The court did not permit the putative class representative to estimate potential damages via a class survey. The court instead cited the Senate Report and emphasized that, to determine whether federal diversity jurisdiction exists and whether remand is required, it is sufficient to determine the amount "in controversy" rather than to calculate exact damages. *Id.* at 986. The court concluded that it could glean sufficient evidence of the amount in controversy from the defendant's records and the plaintiff's complaint allegations. [FN18] *Id.* at 987.

In *Schwartz v. Comcast Corp.*, No. Civ. A. 05-2340, 2005 WL 1799414 (E.D. Pa. July 28, 2005), the plaintiff argued that the court should decline to exercise jurisdiction because more than two thirds of putative class members were Pennsylvania citizens, and thus, the matter fell within CAFA's "home state controversy," "local controversy" or "interest of justice" exceptions. *Id.* at 2. The court allowed the plaintiff to conduct limited discovery on the jurisdictional question, noting that the defendant had "control over the information that would establish the citizenship of the various members of [the plaintiff]'s proposed class." *Id.* at *7.

***Local Controversy and Home State Exceptions.*** CAFA's expansion of federal diversity jurisdiction is circumscribed by statutory exceptions for cases that are truly local in nature. 28 U.S.C. § 1332(d)(4)(A). To determine whether an action falls within the "local controversy" or "home state" exception, the Act directs courts to look at a variety of factors, including the percentage of class members who are citizens of the same state; whether significant relief is sought from one particular defendant; and whether the principal injuries resulting from challenged conduct occurred in a particular state. [FN19]

Application of these exceptions has not been widely litigated to date but courts that have done so have ruled in favor of federal jurisdiction, reasoning that once a defendant shows that the action meets CAFA's basic removal, requirements, the plaintiff has the burden of proving that a statutory exception applies. [FN20]

Courts have been reluctant to find that plaintiffs have satisfied this burden. For example, in *Evans v. Walter Industries, Inc.*, 449 F.3d 1159 (11th Cir. 2006), the court held that attorney affidavits were insufficient to prove that more than two-thirds of the plaintiff class were citizens of the same state, or that a given defendant is one from whom "significant relief" was sought. The court emphasized that the local controversy exception should be used only for cases that are of a truly local nature and acknowledged that plaintiffs may have difficulty producing sufficient evidence of class citizenship. *Id.* at 1166.

In *Robinson v. Cheetah*, No. Civ. A. 06-0005, 2006 WL 468820 (W.D. La. Feb. 27, 2006), the putative class consisted of all persons affected by closure of a bridge after a truck accidentally struck the bridge. *Id.* at *3. The plaintiff named the driver, his employer, and an insurance company as defendants. *Id.* at *4. The defendants removed the case and the plaintiff sought remand based on the local controversy and home state exceptions, arguing that the putative class sought "significant relief" from the driver, who was a citizen of the state in which the action was filed. *Id.* at *3. The court disagreed, holding that the driver was "just small change" compared to the relief sought from the other defendants. *Id.* at *4.

These early rulings suggest that courts will narrowly construe CAFA's exceptions to federal jurisdiction. [FN21]

***Comity and Abstention.*** Several courts have considered whether to refrain from asserting federal jurisdiction based on comity or abstention principles, but no court has relied on these principles to remand a case that was removed based on CAFA's expanded federal diversity jurisdiction.

In *In re Hydrogen Peroxide Antitrust Litigation*, No. 05-666, MDL No. 1682, 2006 WL 999955 (E.D. Pa. Apr.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

11, 2006), the court declined to abstain from exercising jurisdiction over a state law indirect purchaser action even though the court would have to examine issues under state law and a parallel state court action was pending. The court cited the Spiva and Tycko article in ANTITRUST (Fall 2005) for the proposition that, "[u]nder CAFA, plaintiffs attorneys must now bring most indirect purchaser class actions under state antitrust law in federal court," *id.* at *1, and remarked:

> [A]bstention cannot be justified merely because a case arises entirely under state law. [T]hat California law will ultimately govern our substantive inquiry has little, if any, bearing. This is particularly so now that Congress has put its thumb heavily on the federal side of the scales in class actions like these. Hence, this last factor, like all of the others, does not weigh in favor of abstention. CAFA itself weighs against it. *Id.* at *5.

The result was the same in *Steinberg v. Nationwide Mutual Insurance Co.*, 418 F. Supp. 2d 215 (E.D.N.Y. 2006). The court declined to abstain from exercising jurisdiction over a state law class action alleging breach of an insurance contract, finding that "there exists [sic] no 'exceptional' circumstances that warrant the Court's dismissal of this case under *Colorado River.*" *Id.* at 224. Likewise, in *Massey v. Shelter Life Insurance Co.*, No. 05-4106-CV-C-NKL, 2005 WL 1950028 (W.D. Mo. Aug. 15, 2005), the court declined to dismiss a breach of contract case on the basis of comity principles. The court reasoned that CAFA's plain language shows that Congress intended to have class actions that fall within CAFA's jurisdictional requirements litigated in federal court. *Id.* at *2.

These rulings suggest that, due to Congressional intent that CAFA should result in more state law class actions being litigated in federal courts, the court may deny motions to remand that are based on discretionary abstention or comity even though such cases necessarily require application of *48 state law, and some may relate to other actions that are pending in state courts.

*Other Issues.* Courts have ruled on a number of other CAFA-related issues that may have continuing importance to both pre- and post-CAFA cases:

SEVEN-DAY RULE: CAFA's seven-day rule, 28 U.S.C. § 1453(c)(1), provides that:

> Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.

In *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc.*, 435 F.3d 1140 (9th Cir. 2006), the court noted that "the statute as written creates a waiting period of seven days before which an appeal is *too early*, with no upper limit to when an appeal ultimately may be filed." *Id.* at 1145. The court was "somewhat troubled that, in contrast to most statutory construction cases where we are usually asked to construe the meaning of an ambiguous phrase or word, we are here faced with the task of striking a word passed on by both Houses of Congress and approved by the President, and replacing it with a word of the exact opposite meaning." Nevertheless, the court ruled that "not less than" actually means "not more than," citing authority holding that when expressed legislative intent is clearly contrary to the plain language of a statute, the strong presumption that Congress means what it says can be overcome. [FN22]

SIXTY-DAY RULE: Courts also have clarified CAFA's 60-day rule, 28 U.S.C. § 1453(c)(2), which provides that, if a court of appeals accepts an appeal from a ruling on a motion to remand under CAFA, "the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed." Both courts of appeals to address the issue directly held that the period commences when the appeal is granted, not when the petition for interlocutory appeal is filed. [FN23]

AMOUNT IN CONTROVERSY: Courts appear to have settled on the rule that the burden of proving federal jurisdiction includes "any applicable amount in controversy requirement," [FN24] and have ruled on a number of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

issues concerning the amount in controversy, holding that: (1) the cost of class notice may not be used to satisfy this requirement; [FN25] (2) the amount in controversy may be satisfied based either on the aggregate value of the claims to class members or the cost to the defendants; [FN26] (3) it is improper to use jurisdictional discovery, even for a limited 90-day period, to discern the actual damages suffered by putative class members, because jurisdictional discovery on a motion to remand a case removed under CAFA is to be limited to the least burdensome means possible; [FN27] (4) failure to plead the amount in controversy deprives the court of subject matter jurisdiction based on diversity; [FN28] and (5) the amount in controversy is deemed to be satisfied where the party opposing federal jurisdiction does not dispute the amount, reasoning that CAFA expanded federal diversity jurisdiction. [FN29]

ATTORNEY'S FEES: Although many courts have remanded cases that were removed based on CAFA, the courts have not awarded attorney's fees to the plaintiffs despite a presumption in some circuits favoring such an award. Courts in some of these cases found that the defendants raised novel issues under CAFA and thus had a good faith basis for removal. [FN30]

Courts will continue to address a range of issues about CAFA's impact on federal jurisdiction and related pretrial procedures. To date, there have been few surprises and no direct circuit conflicts, although many circuit courts have not yet ruled on these issues. Thus, counsel in antitrust class actions may confront CAFA-related issues of first impression in many federal courts for some time to come.

## CAFA's Impact on Class Counsel's Choice of Forum

An important question looking forward is whether CAFA is causing class counsel to concede state courts that they may prefer as a forum for state law class actions in order to avoid potential delay inherent in removal and remand disputes or for other reasons.

There are no early answers to this question and further data gathering and analysis are warranted. The staff of the Federal Judicial Center (FJC) have commenced such work, and the staff's initial reports, based on several years of pre-CAFA data and some limited post-CAFA data, provide preliminary insights about CAFA's possible impact on class counsel's choice of forum for state law class actions. The FJC staff also have reported survey results that address whether the forum preferences of attorneys in class actions are consistent with litigated outcomes and settlements.

*Class Counsel's Tactical Options.* Class counsel often prefer to assert antitrust claims under federal law, or at least do not have a compelling reason to eschew such claims in favor of similar claims under state law. [FN31] CAFA's expanded diversity jurisdiction does not have an impact on such cases because federal courts have exclusive subject matter jurisdiction over claims under federal antitrust law. In this respect, federal antitrust claims differ from some federal question claims (like RICO) for which state courts have concurrent subject matter jurisdiction. [FN32]

Class counsel may file multiple related federal actions in different courts, and the parties either separately or jointly may seek to have the Judicial Panel on Multidistrict Litigation (JPML) transfer the cases to a single federal district court for coordinated pretrial proceedings. [FN33] CAFA's expanded federal diversity jurisdiction has no direct effect on such proceedings because these cases all originate in federal court based on federal question jurisdiction.

In some cases, however, class counsel may prefer or may be compelled to assert antitrust claims only under state law. *49 This is particularly true for claims on behalf of indirect purchasers because such claims largely are foreclosed under federal antitrust standing principles. By substantially expanding the scope of federal diversity jurisdiction over such claims, CAFA will afford class counsel in some disputes broader tactical choices for filing claims under the antitrust laws of multiple states in a single federal court, and may afford a broader choice of federal courts in which to do so. [FN34]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Class counsel who file such claims in federal court bear the burden of proving that the court has subject matter jurisdiction, [FN35] and may face a latent jurisdictional risk. [FN36] If the defendant does not file a motion to dismiss and instead asserts the lack of subject matter jurisdiction as an affirmative defense (thereby deferring a ruling until summary judgment or trial), facts developed during discovery or rulings on class certification may show that the case does not satisfy CAFA's requirements for diversity jurisdiction. The court may have no choice but to dismiss at that point for lack of subject matter jurisdiction. In fact, because the parties' consent does not waive a lack of subject matter jurisdiction, dismissal may be required even if the defendant acquiesces to a federal forum. [FN37] In cases for which such a risk may arise, counsel may need to use scheduling orders and other procedural mechanisms to obtain discovery and a court ruling on potential jurisdictional defects early in federal court proceedings.

*Federal Judicial Center CAFA Study.* Researchers have begun to gather and analyze data on whether CAFA has caused class counsel to have changed their forum selection tactics for state law class actions.

The staff of the FJC's Research Division issued Progress Reports in May and September 2006 as part of the FJC's Class Action Fairness Act Study. These reports analyze trends in class action filings, initially in four and then in 85 federal district courts during a five-year period from July 2001 through June 2005. [FN38] The May Report shows a large increase in class actions compared to a study covering 1992-94, and a smaller increase during the first six months of 2005 compared to the immediately prior time period. [FN39] The report also shows that most of the class actions filed during the study period were original actions based on federal question jurisdiction, rather than cases removed from state court. The staff predicted that future reports will show a large increase in class action filings post-CAFA, particularly for claims based entirely on state law. May Report at 4.

The reports disaggregate case filings to some extent based on the nature of the claims asserted, but cases with federal antitrust claims are grouped with other federal statutory claims (RICO, Fair Debt Collection Practices Act, Truth in Lending Act). Overall, the percentage of class action filings of this type increased only by slightly more than one percent during the first six months of 2005. [FN40] It should be noted, however, that this category may not include antitrust cases in which claims are asserted solely under state antitrust statutes. The September Report notes a post-CAFA increase in federal court filings for state law contract and property damage claims, but it is not clear that this category covers state law antitrust claims. September Report at 4-6.

The data used for these reports are not sufficiently defined or disaggregated to show whether CAFA has caused class counsel to file more state law antitrust class actions in federal courts. A review of complaints and other pleadings may be necessary to identify antitrust class actions based exclusively on state law that were filed in or remove to federal courts both before and after CAFA. [FN41]

*Federal Judicial Center Survey on Class Action Forum Selection.* The FJC staff recently published another CAFA-related report that uses pre-CAFA data to study several facets of counsels' perceptions and tactical decisions on the choice of a state versus federal forum. This report also compares outcomes achieved in cases that remained in federal court versus cases that were remanded to state court following removal. [FN42]

The FJC staff described numerous detailed findings and a number of general conclusions that warrant closer review and consideration by attorneys facing class action forum selection decisions may wish to consider, including the following:

[] Removed cases in the database (438 total, of which 292 were closed by the time of the survey (pp. 630, 633)) largely were contract and state statutory actions. Approximately 50 percent of the total cases (42 percent of the closed cases) were remanded to state court (pp. 605, 630).

[] In the removed cases that were closed as of the survey date, federal and state courts certified classes with approximately the same frequency (20 and 22 percent, respectively). Although federal judges denied

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

class certification more often (27 percent versus 12 percent), and state judges were more likely to take no action on class certification before the case was closed for other reasons (67 percent versus 51 percent), the staff saw little practical difference between these outcomes (p. 605).

[] In the removed cases for which a class was not certified in federal court or in state court following remand, federal and state courts dismissed cases and entered summary judgment with the same frequency (22 percent dismissed; 8 percent summary judgment) (p. 637).

[] In the removed cases for which classes were certified, federal and state courts approved class settlements with approximately the same frequency (88 and 82 percent, respectively) (p. 638). Although larger overall settlements were achieved in state court (the median in federal and state courts were $300,000 and $850,000, respectively), the median recovery per class member was higher in federal court ($517) versus state court ($350) (p. 639).

[] For closed cases, courts granted class certification in 24 percent, denied class certification in 19 percent, and took no action on certification in 57 percent of the cases (p. 645). An earlier FJC staff study of federal class actions that were terminated in 1992-94 in four district courts showed that the courts certified classes in 39 percent of the cases (pp. 606, 645-46). Of these, 39 percent were certified for *50 settlement purposes only, compared to 58 percent in the 2006 report. The FJC staff acknowledged differences in methodology and case populations, but noted that these data suggests an overall decline in class certification rates, and an increasing proportion of certifications for settlement purposes only (p. 646).

[] Of the cases in which classes were certified, only six went to trial on the merits, resulting in three verdicts for plaintiffs and three for defendants (p. 647). Coupons and some form of injunctive relief each were approved in 29 cases, or approximately 9 percent of those in which class-wide relief was awarded. Only three cases involved non-transferable coupons and no monetary relief, and cy pres relief was approved in only 4 cases (1 percent) (p. 650).

[] Attorney fee awards average 29 percent of the total recovery, roughly tracking the results from the FJC's 1996 study (pp. 651-52).

The FJC staff interpret these data as contradicting conventional wisdom that plaintiff classes and defendants fare better in state and federal courts, respectively. The staff noted that the data show little difference in rulings by state and federal courts on class certification and merits issues, and that federal courts approved 50 percent higher monetary relief per class member in removed cases, compared to the relief that state courts approved following remand (the state courts approved larger total awards per case for attorney fees and expenses, but not disproportionate to the larger average class sizes in the remanded cases) (pp. 653-54). [FN43]

These data appear to support the FJC staff's prediction in the May Report that "the breadth of the statute gives ample reason to anticipate that CAFA will ultimately achieve its goal of facilitating the removal of class actions from state to federal courts." [FN44] The data also may encourage class counsel to file more state law class actions in federal court based on CAFA's expanded diversity jurisdiction.

**The Jury's Still Out**

CAFA jurisprudence still is in its infancy, and antitrust class action attorneys undoubtedly would benefit from further data and analysis of post-CAFA class actions. In particular, data is needed that disaggregates state law antitrust cases filed in or removed to federal courts, to show whether CAFA is affecting forum selection by class counsel and the outcomes of litigated and settled cases in federal and state courts.

Despite the large number of CAFA-related court decisions to date, many predictions of CAFA commentators remain unsettled. For example, one commentator predicted that CAFA's provision on attorneys' fee awards for coupon settlements will cause more class counsel to rely on the lodestar method and thus to delay settlement to generate a higher fee award under that method. [FN45] To date, however, no court has issued a published decision on a post-CAFA fee petition for a coupon settlement. [FN46]

Other issues that remain unanswered include: (1) whether the open-ended time period for removal will lead to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

eleventh-hour removal petitions; (2) whether application of federal rules of evidence and standards for admission of expert testimony will lead to greater exclusion of plaintiffs' expert evidence; (3) what impact CAFA's restrictions on coupons and cy pres relief will have on the type and scope of relief that class counsel seek and achieve in class actions; and (4) what impact CAFA will have in promoting coordinated proceeding in a single court for related direct and indirect purchaser cases.

Further data on this last issue also may benefit the Antitrust Modernization Commission as it considers whether to recommend new legislation to change federal antitrust standing principles and/or to preempt state indirect purchaser statutes.

Courts have provided important early guidance on a range of issues affecting CAFA's expanded federal diversity jurisdiction, but many federal courts still are confronting these issues as a matter of first impression and may do so for some time to come. Although courts have remanded a number of pre-CAFA class actions that were deemed to have commenced prior to the Act's effective date, rulings on important forward-looking issues largely have supported and furthered CAFA's expansion of federal diversity jurisdiction. Coupled with data and insights from the FJC staff calling into question the common assumptions about the benefits to plaintiff classes of litigating in a state versus federal forum, the early returns in CAFA jurisprudence give parties and counsel increasing opportunities and reasons to litigate state law antitrust class actions in federal courts.

[FNa1]. *Gregory G. Wrobel is a shareholder and head of the Antitrust Practice Group of Vedder, Price, Kaufman & Kammholz, P.C., Chicago, IL, and is an associate editor of ANTITRUST. Michael J. Waters is an associate of Vedder Price. The authors acknowledge the assistance of Maren E. Pedersen and Jeremy R. Heuer, Vedder Price project assistant and 2006 summer associate, respectively.*

[FN1]. Class Action Fairness Act of 2005, Pub. L. No. 109-002 (codified at 28 U.S.C. §§ 1332, 1453, 1711-1715).

[FN2]. Mark D. Whitener, *Editor's Note: Exporting Antitrust*, ANTITRUST, Fall 2005, at 6; D. Jarrett Arp, *Be Careful What You Ask for: Unintended Consequences and Unfinished Business Under the Class Action Fairness Act*, ANTITRUST, Fall 2005, at 8; Bruce V. Spiva & Jonathan K. Tycko. *Indirect Purchaser Litigation on Behalf of Consumers After CAFA*, ANTITRUST, Fall 2005, at 12; Ian Simmons & Charles E. Borden, *The Defense Perspective: The Class Action Fairness Act of 2005 and State Law Antitrust Actions*, ANTITRUST, Fall 2005, at 19; Charles B. Casper, The Class Action Fairness Act's Impact on Settlements, ANTITRUST, Fall 2005, at 26; Roger D. Blair & Christine A. Piette, *Coupons and Settlements in Antitrust Class Actions*, ANTITRUST, Fall 2005, at 32; Christian G. Vergonis & Edwin L. Fountain, *Supplemental Jurisdiction in Diversity-Only Class Actions After* Exxon Mobil Corp. v. Allapattah Services, Inc., ANTITRUST, Fall 2005, at 38.

[FN3]. Spiva & Tycko, *supra* note 2, at 12.

[FN4]. Simmons & Borden, *supra* note 2, at 19.

[FN5]. Arp, *supra* note 2, at 9.

[FN6]. Casper, *supra* note 2, at 28.

[FN7]. *See generally* Antitrust Modernization Commission-Meetings, *available at* http://www.amc.gov/commission_meetings.htm. The Commission held deliberative meetings in late July 2006 to discuss, among other things, indirect purchaser reform. The Commission has debated a number of suggestions on this topic, including new federal legislation to preempt state indirect purchaser laws and/or to change federal jurisprudence on the standing of indirect purchasers to recover damages under federal antitrust law, but has not yet reached a consensus or adopted a formal recommendation on these issues. Antitrust Modernization Commission,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Supplemental Civil Remedies-Indirect Purchaser Discussion Outline* (July 20, 2006), *available at* http:// www.amc.gov/pdf/meetings/CivRem-IndPSupplOutline060720circ.pdf (providing present commissioner positions on indirect purchaser reform proposals). Numerous entities including the ABA Section of Antitrust Law and the American Antitrust Institute have submitted comments to the Commission regarding its proposed reform. *See, e.g.,* Letter from Donald F. Klawiter, Chair, ABA Section of Antitrust Law, to the AMC (July 19, 2006), *available at* http:// www.amc.gov/public_studies_fr28902/remedies_pdf/060719-ABA_civil_remedies.pdf); Comments of the American Antitrust Institute Working Group on Civil Remedies to the AMC (July 10, 2006), *available at* http://www.amc.gov/public_studies_ fr28902/remedies_pdf/060710-AAI%20Civil%20Rem.pdf).

[FN8]. As of October 7, 2006, approximately 86 of these decisions involved a ruling on a remand motion; remand was denied and the federal court retained jurisdiction in 15 of those cases. These findings are drawn from commencement-related cases listed on the CAFA Law Blog and Class Action Law Web sites, http://www.cafalawblog.com and http://www.classactionprofessor.com/blog/CAFA_ Cases.html, respectively. The findings were based on decisions on remand motions in published decisions only, including appellate decisions, but not accounting for any appeals that may have been pending as of the date of review.

[FN9]. *See, e.g.,* Boxdorfer v. DaimlerChrysler Corp., 396 F. Supp. 2d 946 (C.D. Ill. 2005) (holding amended complaint adding new plaintiffs related back to the original complaint, such that the suit commenced pre-CAFA); Phillips v. Ford Motor Co., 435 F.3d 785 (7th Cir. 2006) (same); Plubell v. Merck & Co., 434 F.3d 1070 (8th Cir. 2006) (holding replacement of class representative does not commence a new suit for the purposes of CAFA).

[FN10]. Santamarina v. Sears, Roebuck & Co., No. 06-3054, 2006 WL 2979396, *3 (7th Cir. Oct. 19, 2006) (an amended class action complaint related-back to the original complaint because the defendant was the same in both complaints, the plaintiffs were from the same class, the claim was essentially the same, and plaintiff class alleged the same general set of facts).

[FN11]. Carpanelli v. American Standard Co., No. C 06-0004 WDB, 2006 WL 568307, at *5 (N.D. Cal. Mar. 3, 2006).

[FN12]. *Id.* Similarly, in *In re Compact Disc Minimum Advertised Price Antitrust Litigation,* 370 F. Supp. 2d 320 (D. Me. 2005), a parens patriae and class action lawsuit that was pending in federal court prior to CAFA's effective date, the court held that CAFA's notice requirements do not apply because the lawsuit commenced prior to CAFA's enactment. The case was filed in federal court based on federal question jurisdiction and thus there was no basis for the defendant to assert that CAFA applied due to an amendment to the complaint or a change in parties.

[FN13]. Braud v. Transport Service Co. of Ill., 445 F.3d 801, 805 (5th Cir. 2006). *See also* Knudsen v. Liberty Mut. Ins. Co., 411 F.3d 805, 807 (7th Cir. 2005) (dicta stating: "a new claim for relief (a new 'cause of action' in state practice), the addition of a new defendant, or any other step sufficiently distinct that courts would treat it as independent for limitations purposes, could well commence a new piece of litigation for federal purposes even if it bears an old docket number for state purposes"); Schillinger v. 360Networks USA, Inc., No. 06-138-GPM, 2006 WL 1388876 (S.D. Ill. May 18, 2006) (holding that the addition of a new defendant after CAFA's effective date "commenced" the litigation and that removal pursuant to CAFA was proper). *But see* Prime Care of Northeast Kansas, LLC v. Blue Cross and Blue Shield of Kansas City, Inc., No. 05-2227-KHV, 2006 WL 2734469 (D. Kan. Sept. 25, 2006) (holding amendment adding new defendants related back because plaintiffs' prior omission of these parties was the result of mistake). These decisions do not address whether an existing defendant has the right to remove a case in which the addition of a new defendant is deemed to commence a new action to which CAFA applies. Note that any one defendant can remove under CAFA, 28 U.S.C. § 1453(b), unlike the general removal provision which requires the consent of all defendants. 14A CHARLES WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3731, at 504 (2d ed. 1985) (citing numerous cases, including Chicago, *R.I. & P.R. Co. v. Martin,* 178 U.S. 245 (1900), for the proposition that removal generally requires consent of all defendants).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN14]. Class counsel in a pre-CAFA state court class action may acquiesce to a federal forum by amending the state court complaint to add parties or claims in a manner that may permit removal by the defendant, rather than dismissing the state court case and filing a new action in federal court based on CAFA's expanded diversity jurisdiction. Note, however, that if the relation-back doctrine applies to determine whether CAFA provides a basis for federal diversity jurisdiction, and such jurisdiction exists only if the amendment is deemed to commence a new action, the amended complaint may be subject to a new limitations period that commences from the date of amendment. *See, e.g.*, Mayle v. Felix, 545 U.S. 2562 (2005) (holding that amended complaint was barred by statute of limitations because it did not sufficiently relate back to the original complaint).

[FN15]. *Id. See also In re* Textainer Partnership Securities Litigation, No. C05-0969MMC, 2005 WL 1791559 (N.D. Cal. July 27, 2005) (holding that CAFA shifts the burden of proof when removal is contested); Waitt v. Merck & Co., No. C05-0759L, 2005 WL 1799740 (W. D. Wash. July 27, 2005) (same).

[FN16]. Brill v. Countrywide Home Loans, Inc., 427 F.3d 446 (7th Cir. 2005); Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676 (9th Cir. 2006).

[FN17]. *Brill*, 427 F.3d at 448. Judge Easterbrook also cited *Pierce v. Underwood*, 487 U.S. 552 (1988), in which the Supreme Court held that if a declaration in a report of a congressional committee does not correspond to any new statutory language, then it is ineffectual. *Id.* at 566-68.

[FN18]. *See also* Sweeney v. Federated Retail Holdings, Inc., No. 06-10887, 2006 WL 2521410, *2 (E.D. Mich. Aug. 30, 2006)(after court raised jurisdictional issue sua sponte, plaintiffs argued that the class would have more than 100 members with aggregate damages in excess of $5 million; the court found a sufficient basis for jurisdiction based on pleadings alone, but stated that defendants could challenge jurisdiction if appropriate as discovery progressed).

[FN19]. "(4) A district court shall decline to exercise jurisdiction under paragraph (2)-(A)(i) over a class action in which-(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed; (II) at least 1 defendant is a defendant-(aa) from whom significant relief is sought by members of the plaintiff class; (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and (cc) who is a citizen of the State in which the action was originally filed; and (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or (B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(A)-(B) (2005).

[FN20]. *See, e.g.*, Evans v. Walter Indus., Inc., 449 F.3d 1159, 1164 (11th Cir. 2006); Seat v. Farmers Group, Inc., No. CIV-06-0309-F, 2006 WL 1285084, at *2 (W.D. Okla. May 5, 2006).

[FN21]. *See* Spiva & Tycko, *supra* note 2, at 12 (predicting that state antitrust laws will almost always be interpreted by federal courts and that state courts will have diminished ability to enforce their own antitrust laws).

[FN22]. *Id.* at 1146. A lengthy dissent from the Ninth Circuit's denial of rehearing en banc questioned the panel's reasoning as a misuse of judicial prerogative: "The Republic will certainly survive this modest, but dramatic, emendation of the *United States Code*; I am not so sanguine that in the long term it can stand this kind of abuse of our judicial power." Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Serv., Inc., 448 F.3d 1092, 1095 (9th Cir. 2006) (Bybee, J., dissenting).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN23]. *See Evans*, 449 F.3d at 1162; Patterson v. Dean Morris, L.L.P., 444 F. 3d 365 (5th Cir. 2006).

[FN24]. *See, e.g.*, Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 682-83 (9th Cir. 2006); Rippee v. Boston Market Corp., 408 F. Supp. 2d 982, 984-85 (S.D. Cal. 2005).

[FN25]. Bryant v. General Motors Corp., No. 05-4028 (W.D. Ark. Sept. 12, 2005), *available at* http://www.cafalawblog.com.

[FN26]. Berry v. American Express Publ'g Corp., 381 F. Supp. 2d 1118, 1123 (C.D. Cal. 2005).

[FN27]. *Rippee*, 408 F. Supp. 2d at 985.

[FN28]. Holland v. Cole Nat'l Corp., No. 04-CV-246, 2005 WL 1242349, at *14 (W.D. Va. May 24, 2005). *See also* Morgan v. Gay, No. Cv-6-1371, 2006 WL 2265302 (D.N.J. Aug. 7, 2006) (court lacked removal jurisdiction where the plaintiffs' complaint specifically capped damages at $5 million).

[FN29]. Schemmer v. ChartONE, Inc., No. 1:05-CV-02923, 2 (N.D. Ohio Feb. 1, 2006), *available at* http://www.cafalawblog.com.

[FN30]. *See* Lussier v. Dollar Tree Stores, Inc., No. CV 05-768-BR, 2005 WL 2211094, at *1 (D. Or. Sept. 8, 2005); Phillips v. Ford Motor Co., No. 05-CV-503, 2005 WL 3263905, at *1 (S.D. Ill. Nov. 30, 2005).

[FN31]. *See, e.g.*, Reed v. Advocate Health Care, No. 06C 3337 (N.D. Ill. filed June 20, 2006); Unger v. Albany Med. Center, No. 06-cv-00765 (N.D.N.Y. filed June 20, 2006); Maderazo v. Hospital Corp. of Am., Inc., No. 06-cv-00535 (W.D. Tex. filed June 20, 2006); Clarke v. Baptist Mem. HealthCare Corp., 06-cv-02377 (W.D. Tenn. filed June 20, 2006). In each complaint, filed by the same plaintiffs' attorneys, the putative class representative challenges an alleged conspiracy among hospitals in the area to fix and stabilize nurse compensation.

[FN32]. Tafflin v. Levitt, 493 U.S. 455, 458 (1990) (holding that state courts have concurrent jurisdiction over civil RICO claims).

[FN33]. "Proceedings for the transfer of an action under this section may be initiated by ... (ii) motion filed with the panel by a party in any action in which transfer for coordinated or consolidated pretrial proceedings under this section may be appropriate. A copy of such motion shall be filed in the district court in which the moving party's action is pending." 28 U.S.C. § 1407 (c)(ii).

[FN34]. Consider, for example, a state law indirect purchaser case in which the defendant and one of the named plaintiffs both are citizens of California. Previously, due to the limitations in 28 U.S.C. § 1332(a), such a case could be filed only in state court regardless of the citizenship of the remaining class members; under CAFA, by virtue of 28 U.S.C. § 1332(d)(2), federal diversity jurisdiction may exist (ignoring CAFA's exceptions) if any one member of the putative resides outside California.

[FN35]. *See, e.g.*, Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005) ("whichever side chooses federal court must establish jurisdiction").

[FN36]. This concept was recently addressed by the Seventh Circuit in *Santamarina*, No. 06-3054, 2006 WL 2979396, at *1. The plaintiff class in that case originally filed its complaint in a California state court. *Id.* After the plaintiffs amended the complaint, the defendant, Sears, removed the case to a California federal district court. *Id.* The district court judge denied plaintiffs' motion to remand and the multidistrict litigation panel transferred the case

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to the Northern District of Illinois. *Id.* Once there, the plaintiffs filed a motion with the Northern District to reconsider the California district court's remand ruling. *Id.* The court heard the motion and held that the suit had been improperly removed. *Id.* On appeal, Sears questioned the court's ability to reconsider the initial ruling, but the Seventh Circuit held that: "Not to reconsider in such circumstances would condemn the parties to the unedifying prospect of continued litigation when they knew that a possibly critical ruling was in error, and unless it became moot in the course of proceedings, would compel a reversal of the final judgment at the end of the case." *Id.*

[FN37]. *See, e.g.*, Louisville and Nashville R.R. v. Motley, 211 U.S. 149 (1908) (Court on its own motion ruled that federal courts lacked subject matter jurisdiction over case). A parallel risk also may arise if the defendant removes a state law class action, but in such a case class counsel may be more likely to raise the jurisdictional issue for immediate ruling via a motion to remand, and the district court's ruling may be reviewed on an interlocutory basis, 28 U.S.C. § 1453(c)(1).

[FN38]. Memorandum from Thomas Willging & Emery Lee of the Federal Judicial Center Research Division, to the Advisory Committee on Civil Rules (May 22, 2006), *available at* http://www.fjc.gov/library/fjc_catalog.nsf (search for "Interim Progress Report on Class Action Fairness Act Study") [hereinafter cited as *May Report*]; Memorandum from Thomas Willging & Emery Lee of the Federal Judicial Center Research Division, to the Advisory Committee on Civil Rules (Sept. 7, 2006), *available at* http://www.fjc.gov/library/fjc_catalog.nsf (search for "The Impact of the Class Action Fairness Act of 2005") [hereinafter cited as *September Report*]. The FJC staff plans to issue another report in the spring of 2007 as part of this project, analyzing data for class actions filed in or removed to federal district courts between July 1, 2005 and June 30, 2006. *September Report, supra*, at 1.

[FN39]. *May Report, supra* note 38, at 1-2. The data show a substantial increase in the later study period (1,875 class actions in the four jurisdictions examined in 2001-2005) compared to the earlier study period (407 class actions in the same four jurisdictions in 1992-1994), but only a small portion of the later study period post-dates CAFA. *Id.* Further analysis of data for a longer post-CAFA time period is warranted to better discern whether any increase in class actions that occurred during 2005 or that may occur thereafter is attributable to CAFA or to other factors. In a recent interview, FJC staff member Thomas E. Willging stated that the staff has done additional analysis suggesting that CAFA is causing additional class actions to be filed in federal courts at a rate that is "larger than anyone anticipated." Marcia Coyle, *Class Action Changes Bring Quick Impact*, 29 NAT'L L.J. 6 (Oct. 2, 2006). This analysis is scheduled for release in the Spring 2007.

[FN40]. *September Report, supra* note 38, at 7. The *September Report* notes a significant increase in removed cases and federal class actions based on diversity. Specifically, the report states that cases removed from state courts increased from 18% to 23% of all federal court class actions (from approximately 210 cases from July-December 2004 to 310 cases from January-June 2005), and that federal court class actions based on diversity of citizenship increased from 13% to 19% of all federal court class actions (from approximately 120 cases from July-December 2004 to 280 cases from January-June 2005). Id. at 2, 11, 12. (It is unclear from the Report whether the staff used a multi-year weighted average or data from a date certain in determining pre-CAFA percentages.) The staff suggest that these increases are due at least in part to CAFA. *Id.* at 11, 12.

[FN41]. Summary data are not available on the number of state law antitrust cases that have been removed to federal courts either before or after CAFA. Some data bearing on this point may be gleaned from a review of case files of the Judicial Panel on Multidistrict Litigation, but consolidation through the Panel may not be sought for some (and perhaps many) state law antitrust class actions that are removed to federal court. Data also may be obtained through a review of district court files for removed actions that are designated as antitrust cases on the civil cover sheet. *See also* Letter from Patrick E. Cafferty to the AMC (June 2, 2006), *available at* http://www.amc.gov/public_ studies_fr28902/remedies_pdf/060602_Cafferty_Persky_Gustafson_Remedies.pdf (providing information about indirect purchaser class action settlements gleaned from public sources, cases in which the authors participated, and information received from practitioners). Ideally, such data also would control for the number of state law class actions filed in and litigated in state courts both before and after CAFA, but summary data on state law class actions (antitrust or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

otherwise) do not appear to be readily available.

[FN42]. Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does It Make?*, 81 NOTRE DAME L. REV. 591 (2006). The report is based on responses by 728 attorneys in 628 cases to a questionnaire sent to over 2,000 attorneys in 1,235 class actions filed in or removed to federal courts between 1994 and 2001, and terminated between July 1999 and December 2002. The report does not disaggregate data on antitrust class actions and the staff did not gather data on class actions filed in state court that were not removed to federal court. *Id.* at 600-01.

[FN43]. The survey does not disaggregate data by specific jurisdiction and thus does not address whether federal district courts in a particular state may be more favorable for defendants in class action litigation than certain "plaintiff-friendly" state courts in that jurisdiction, such as Madison County, Illinois, or Mississippi's 22nd Judicial Circuit.

[FN44]. *May Report, supra* note 38, at 3. *See also* Shruti Daté Singh, *Madison County Goes Quiet*, 29 CRAIN'S CHI. BUS. 37, Sept. 11, 2006, at 37 (noting a sudden drop in the number of class actions filed in Madison County, Illinois, from 106 in 2003 to one thus far in 2006, and suggesting that the drop is due at least in part to CAFA).

[FN45]. *See* Casper, *supra* note 2, at 28 (predicting such an effect).

[FN46]. Note, however, that the Seventh Circuit recently cited CAFA's call for heightened judicial scrutiny of coupon-based settlements in rejecting a class action settlement involving compensation via pre-paid mailing envelopes, even though the case was initiated pre-CAFA. Synfuel Techs., Inc. v. DHL Express (USA), Inc., Nos. 05-1450, 05-1596, 05-2914, 05-3022, 2006 WL 2588925, *7 (7th Cir. Sept. 11, 2006). In ruling that the lower court abused its discretion in approving the settlement, the Seventh Circuit's decision suggests that courts applying CAFA's provisions on coupon settlements are likely to scrutinize such settlements carefully.

21-FALL Antitrust 45

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.